1

2

3

4

5

6

7

8

9              IN THE UNITED STATES DISTRICT COURT

10            FOR THE EASTERN DISTRICT OF CALIFORNIA

11   ALONZO DEON JOHNSON,

12            Petitioner,              No. CIV S-03-2063 JAM JFM P

13       vs.

14   CLAUDE E. FINN, Warden,

15            Respondent.

16   _____/

17   DARRYL L. THOMPSON,

18            Petitioner,              No. CIV S-04-2208 JAM JFM P

19       vs.

20   TOM L. CAREY, Warden,

21            Respondent.             <u>FINDINGS AND RECOMMENDATIONS</u>

22   _____/

23            Petitioners are state prisoners proceeding through counsel with an application for

24   a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioners claim their constitutional rights

25   were violated by the prosecutor's improper use of peremptory challenges to exclude black jurors.

26   Petitioner Johnson challenges the peremptory challenge to juror Jones.  (Johnson Pet. at 5.)

1

1  Petitioner Thompson challenges the peremptory challenges to jurors Jones, Green and Trimble.
2  (Thompson Pet.)

3          Petitioners were tried together before a single jury in 2000.  Petitioner Johnson
4  challenges his conviction on charges of shooting at an occupied motor vehicle, Cal. Penal Code
5  § 246.  Petitioner Johnson was also found to be armed, personally used a weapon and committed
6  the crimes for the benefit of a gang, and engaged in street terrorism while on bail; and was an ex-
7  felon in possession of a firearm while on bail/own recognizance.  Petitioner Johnson was
8  sentenced to fifteen years, four months in state prison.

9          Petitioner Thompson challenges his conviction on charges of two counts of
10  shooting at an occupied motor vehicle.  Petitioner Thompson was also found to have used a gun,
11  to have been armed, and to have committed the crimes for the benefit of a gang.  Petitioner
12  Thompson was convicted of willfully participating in a street gang within the meaning of Cal.
13  Penal Code § 186.22(a), and being a felon in possession of a firearm (Cal. Penal Code
14  § 12021(a)).  He admitted he had served a prior prison term within the meaning of Cal. Penal
15  Code § 667.5(a), and was sentenced to 14 years and 4 months in state prison on July 5, 2000.

16          Respondents filed answers.  On July 5, 2005, petitioner Johnson filed a document
17  entitled "Supplemental Letter," in which he asks the court to consider Johnson v. California, 545
18  U.S. 162 (2005).

19          On February 28, 2005, counsel for respondent filed a motion to consolidate
20  petitioner's co-defendant's case, Thompson v. Carey, 2:04-cv-2208, with the instant action.[1]  By
21  order filed September 19, 2005, the district court related Thompson v. Carey, 04-2208, to the
22  instant case instead of consolidating them.

23  /////
24  /////

25  _____
26      [1]  A court may take judicial notice of court records.  See MGIC Indem. Co. v. Weisman,
803 F.2d 500, 505 (9th Cir. 1986); United States v. Wilson, 631 F.2d 118, 119 (9th Cir. 1980).

FACTS[2]

> Because the appellate contentions do not require review of the sufficiency of the evidence, we will not set out the underlying facts in any detail.  It is sufficient to say that in response to profane threats from [petitioners] based on their nonaffiliation with his gang, a family enlisted friends in a convoy of vehicles to help them move to a new location.  When the moving party arrived, a trio of shooters, which included the [petitioner and his co-defendant Darryl Lammar Thompson], fired at them.

(People v. Johnson, slip op. at 3.)

ANALYSIS

I.  Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406 (2000)).

/////

---

[2]  The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Johnson, No.# C036080 (October 31, 2002), a copy of which is attached as Exhibit A to Respondent's Answer, filed January 22, 2004 (CIV S-03-2063 JAM JFM P).

1    Under the "unreasonable application" clause of section 2254(d)(1), a federal

2  habeas court may grant the writ if the state court identifies the correct governing legal principle

3  from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

4  prisoner's case.  <u>Williams</u>, 529 U.S. at 413.  A federal habeas court "may not issue the writ

5  simply because that court concludes in its independent judgment that the relevant state-court

6  decision applied clearly established federal law erroneously or incorrectly.  Rather, that

7  application must also be unreasonable."  <u>Id.</u> at 412; <u>see also</u> <u>Lockyer v. Andrade</u>, 538 U.S. 63,

8  123 S.Ct. 1166, 1175 (2003) (it is "not enough that a federal habeas court, in its independent

9  review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

10    The court looks to the last reasoned state court decision as the basis for the state

11  court judgment.  <u>Avila v. Galaza</u>, 297 F.3d 911, 918 (9th Cir. 2002).

12  II.  <u>Petitioners' Claim</u>

13    Petitioners claim that their convictions must be reversed because the prosecutor

14  exercised peremptory challenges to strike three jurors on the basis of race, in violation of <u>Batson</u>

15  <u>v. Kentucky</u>, 476 U.S. 79 (1986).

16    A.  <u>State Court Decision</u>

17    The last reasoned decision with respect to petitioners' claim is the opinion of the

18  California Court of Appeal on petitioners' direct appeal.  The Court of Appeal explained the facts

19  surrounding this claim and its legal analysis as follows:

20        On three occasions, [petitioners] contested a peremptory challenge
         of the prosecutor to a prospective juror as being based on invidious
21        group bias.  (*Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d
         69] (*Batson*) [equal protection]; *People v. Wheeler* (1978) 22
22        Cal.3d 258, 280 (*Wheeler*) [right to representative jury].)  Each
         time, the trial court concluded [petitioners] had failed to make a
23        prima facie showing that the prosecutor had an invidious basis for
         the peremptory challenge.  (*People v. Box* (2000) 23 Cal.4th 1153,
24        1187-1188.)  We first relate the circumstances of each peremptory
         challenge and the defense objections.

25

26  /////

4

A

Mr. J.:  Mr. J. was part of the first group of jurors called into the box.  The court and the parties examined him only briefly.  Nothing in his questionnaire or responses in court were out of the ordinary.  He was the prosecution's seventh peremptory challenge.

Defense counsel objected, claiming he "didn't see anything wrong with any of his responses."  Because the excused juror belonged to the same cognizable group as [petitioners], defense counsel stated this established a prima facie case of invidious group bias on the prosecutor's part in excusing him.  The court agreed that in theory a defendant could establish a prima facie showing based on a single challenge, but it would be difficult with no other factors.  The court concluded the mere fact that the juror belonged to a cognizable group was not sufficient.  It did not ask the prosecution to explain the basis for the exercise of the peremptory challenge.

Mr. G.:  This juror was part of the third batch seated after the second set of peremptory challenges.  The court asked him about several confusing responses on his questionnaire, and he seemed to have difficulty explaining himself regarding his familiarity with Stockton-area gangs.  His questionnaire noted that he lacked a high school education, and his adult son had been arrested three times for drug offenses.  He was the prosecution's ninth peremptory challenge.

Defense counsel objected.  He noted the prosecutor had now excused two of the few members of the cognizable group in the pool of jurors, but did not point to any other circumstances suggesting a basis in invidious group bias.  The court did not believe this was sufficient, in light of the circumstances of Mr. G.'s son and what the court termed the equivocal and confused responses of the juror (although defense counsel disputed that Mr. G. had sounded confused).  The court concluded:  "Mr. [G.] would have been challenged by almost any deputy district attorney or probably by most defense attorneys, in my opinion. . . .

Mr. T.:  This juror was first called during alternate selection.  His name had come up in private questioning of another juror, who told the court he was an employee pursuing a group grievance against her.  Mr. T. then replaced her in the box after the prosecutor excused her.  In his questionnaire and responses in court, he noted a past bad experience with his family law attorney in a custody matter.  He also admitted to having previous arrests for driving under the influence (DUI), domestic assault and criminal assault; charges were dropped for the latter two.  He did not believe the police and prosecution had treated him fairly in the DUI matter.  In a previous job, he worked with disadvantaged youths, including gang members.  He had grown up near the area where the present crimes took place, and was aware of the gang

activity there and in his own neighborhood.  The prosecutor exercised his second peremptory challenge to an alternate to excuse him.

Defense counsel objected.  He noted the only three members of the cognizable group were now off the jury as a result of the prosecutor's exercise of his challenges.  He thought Mr. T., as a former military policeman, was pro-prosecution if anything, and thus there must be a basis in invidious group bias for removing him from the jury.  The court disagreed; it believed the juror's arrests and his close involvement with gangs in the vicinity of the crime were more than sufficient bases to excuse him from the jury.

B

A party establishes a prima facie showing of invidious group bias when there is a reasonable inference from the circumstances as a whole that this was the basis for the peremptory challenge.  (*Box, supra*, 23 Cal.4th at pp. 1187-1188.)[3]  More than the juror's mere status as a member of a "cognizable group" is necessary.  (*Id.* at pp. 1187-1188, 1188-1189.)

When a trial court denies a motion to contest the basis of a peremptory challenge because there is no prima facie showing, we review the entire record of voir dire; if there are grounds upon which a prosecutor could reasonably have premised a challenge, we affirm.  (*Box, supra*, 23 Cal.4th at p. 1188.)  Contrary to the belief of [petitioners], we do not accord great significance to a comparison of the characteristics of the contested jurors with those of the retained jurors.  "[T]he very dynamics of the jury selection process make it difficult, if not impossible, on a cold record, to evaluate or compare the peremptory challenge of one juror with the retention of another juror [who] on paper appears to be substantially similar.  [Any] attempt to make such an analysis . . . is

---

[3]  We reject [petitioners'] efforts to accord talismanic import to the differences between the choice of phrase in *Batson, supra*, 476 U.S. at page 96 ("raise an inference"), and *Wheeler*'s use of "strong likelihood" (*Wheeler, supra*, 22 Cal.3d at p. 280).  For over 20 years there has been authority that *Wheeler* requires only a reasonable inference of invidious group bias (*People v. Fuller* (1982) 136 Cal.App.3d 403, 423 & fn.25); *Box*, decided after the trial in this matter, asserted there was no difference between the two formulations.  (*Box, supra*, 23 Cal.4th at p. 1188, fn. 7.)

That the Ninth Circuit may believe our courts from 1994 to *Box* have acted in derogation of the *Batson* standard (e.g., *Cooperwood v. Cambra* (9th Cir. 2001) 245 F.3d 1042, 1047; *Wade v. Terhune* (9th Cir. 2000) 202 F.3d 1190, 1196-1197) does not concern us, unless and until binding authority concurs.  The issue is still being briefed before the California Supreme Court in *People v. Johnson* (2001) 88 Cal.App.4th 318 [105 Cal.Rptr. 727], review granted July 18, 2001, S097600.  (NB:  Subsequently, the California Supreme Court issued its ruling, which was ultimately reversed by the United States Supreme Court in <u>Johnson v. California</u>, 545 U.S. 162 (2005).)

highly speculative and less reliable than the determination made by the trial judge who witnessed the process. . . ." (*People v. Johnson* (1989) 47 Cal.3d 1194, 1221; accord, *Box, supra,* 23 Cal.4th at p. 1190.) One impermissible challenge is sufficient to require dismissal of the venire and resumption of the selection process once again. (*People v. Fuentes* (1991) 54 Cal.3d 707, 715 (*Fuentes*).)

We initially reject the [petitioners'] efforts to impute reversible error to the trial court's use of the term "systematic exclusion" in ruling on their motions. This is a frequent judicial malapropism; the term in its technical sense refers only to the lack of representation of cognizable groups in a venire. (*Fuentes, supra,* 54 Cal.3d at p. 716, fn. 4.) As noted above, the trial court was

explicitly aware there did not need to be any systemic invidious bias to grant the [petitioners'] motion.

The [petitioners] rely on authority that the exclusion of all members of a cognizable group from a jury *may* give rise to an inference of invidious group bias. This is not, however, a determinative factor. (*Box, supra,* 23 Cal.4th at pp. 1188-1189; *People v. Sanders* (1990) 51 Cal.3d 471, 500-501 [but concluding that under all the circumstances the trial court did not err in finding there was nothing else to support prima facie case of invidious discrimination].)

We agree there is nothing in the questionnaire or voir dire responses of Mr. J to suggest a nondiscriminatory basis for a peremptory challenge. He did indicate in his questionnaire that he would not follow the court's instructions, but neither the court nor the parties questioned him whether this was a mistake. But the trial court correctly noted the possible difficulties Mr. G. (a high school dropout) might have in expressing himself or understanding the proceedings, the convictions of Mr. G.'s son, Mr. T.'s negative feelings toward law enforcement about his DUI arrest, and his possible sympathies for gang members (either through familiarity from his neighborhood or his previous job) as all being red flags to trial attorneys (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1123-1124; *People v. Turner* (1994) 8 Cal.4th 137, 171; *People v. Sims* (1993) 5 Cal.4th 405, 430; *People v. Cummings* (1993) 4 Cal.4th 1233, 1282.) With the trial court's firm belief that the latter two warranted exclusion from the jury, there is nothing to add to the mere circumstance of Mr. J.'s membership in the cognizable group for the [petitioners'] showing in favor of their motions. That various seated jurors may have shared circumstances of a conviction or arrest (or arrested or convicted relatives) is not enough to gainsay the trial court's finding; the [petitioners'] cross-comparison does not adequately account for the combination of Mr. G.'s possible cognitive shortcomings, and Mr. T.'s belief that his DUI conviction was unfair. Moreover, efforts at cross-

1    comparison do not account for other factors in the seated jurors
     that the prosecutor may have found to offset the negatives.  As the
2    record provides an adequate factual basis for the trial court's
     conclusions in this regard, and the trial court displayed sufficient
3    attentiveness to the issue, we do not find any basis to reverse the
     convictions.
4    (People v. Johnson, slip op. at 3-9.)

5                    B.  Prior Proceedings in this Court

6              By order filed August 15, 2007, this court found the California Court of Appeal

7    used the incorrect legal standard in determining whether petitioners had established a prima facie

8    case of racial discrimination.  (Id. at 2-3.)[4]  Accordingly, this court determined that a de novo

9    standard of review, and not the AEDPA deferential standard, should be used to decide

10   petitioners' Batson claim.  August 15, 2007 Order at 2-3, citing Paulino v. Castro, 371 F.3d

11   1083, 1090 (9th Cir. 2004) (federal court of appeals examined Batson claim de novo because the

12   state court used the wrong legal standard when analyzing whether defendant made a prima facie

13   showing of bias).  This court also found that petitioners had demonstrated a prima facie case of

14   racial discrimination with respect to the prosecutor's exercise of peremptory challenges against

15   jurors Mr. J, Mr. G and Mr. T, who were all of the African-American prospective jurors

16   remaining in the jury pool when the prosecution exercised the peremptory challenge to Mr. J.

17   (August 15, 2007 Order at 5-6.)

18             On January 30, 2008, this court held an evidentiary hearing; the prosecutor

19   testified as to the reasons supporting his peremptory challenges used to remove three African-

20

21             [4]  Petitioners' state trial occurred in April of 2000, before Box was decided on August 17,
     2000.  The appellate court denied their direct appeal in 2002, after Box issued.  In affirming the
22   trial court's denial of petitioners' prima facie claim, the appellate court, relying on Box, stated
     that petitioners were required to show a "reasonable inference" of bias in order to demonstrate a
23   prima facie case.  However, although the court used the required language from Box, it did not
     clearly state it was applying the reasonable inference test consonant with Batson, as opposed to
24   the more stringent test set forth in Wheeler.  Given its rejection of the distinction between the
     two standards, it is not clear that the appellate court did not apply the Wheeler "strong
25   likelihood" standard in its analysis, as California courts had always done.  Under the
     circumstances, it appears that the California Court of Appeal employed an incorrect legal
26   standard in determining whether petitioners had established a prima facie case.

                                                    8

American potential jurors from the jury venire.  Subsequent to that evidentiary hearing, on March

20, 2008, petitioners filed a "Post-Hearing Opening Brief..  On April 3, 2008, respondent filed a

"Post-Evidentiary Hearing Brief."  This court has considered those briefs in issuing these

findings and recommendations.

C.  Legal Standards

Purposeful discrimination on the basis of race or gender in the exercise of

peremptory challenges violates the Equal Protection Clause of the United States Constitution.

See Batson v. Kentucky, 476 U.S. 79 (1986); Johnson v. California, 545 U.S. 162 (2005); Snyder

v. Louisiana, ____ U.S. ____, 128 S.Ct. 1203 (2008).  So-called Batson claims are evaluated

pursuant to a three-step test:

> "First, the defendant must make out a prima facie case 'by showing
> that the totality of the relevant facts gives rise to an inference of
> discriminatory purpose.' [Citations].  Second, once the defendant
> has made out a prima facie case, the 'burden shifts to the State to
> explain adequately the racial exclusion' by offering permissible
> race-neutral justifications for the strikes. [Citations .] Third, '[i]f a
> race-neutral explanation is tendered, the trial court must then
> decide . . . whether the opponent of the strike has proved
> purposeful racial discrimination.' [Citation.]"

Johnson v. California, 545 U.S. at 168 (footnote omitted); Tolbert v. Page, 190 F.3d 985, 987-88

(9th Cir. 1999) (en banc).  This court will evaluate petitioners' Batson claims with reference to

the standards set forth above.

In order to establish a prima facie case of racial discrimination, petitioners must

show that "(1) the prospective juror is a member of a "cognizable racial group," (2) the

prosecutor used a peremptory strike to remove the juror, and (3) the totality of the circumstances

raises an inference that the strike was motived by race." Boyd v. Newland, 467 F.3d 1139, 1143

(citing Batson, 476 U.S. at 96 and Cooperwood v. Cambra, 245 F.3d 1042, 1045-46 (9th Cir.

2001)).  A prima facie case of discrimination "can be made out by offering a wide variety of

evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory

1   purpose.'" <u>Johnson v. California</u>, 545 U.S. at 169 (quoting <u>Batson</u>, 476 U.S. at 94.)[5]  In

2   evaluating whether a defendant has established a prima facie case, a reviewing court should

3   consider the "'totality of the relevant facts' and 'all relevant circumstances' surrounding the

4   peremptory strike." <u>Boyd</u>, 467 F.3d 1146 (quoting <u>Batson</u>, 476 U.S. at 94, 96).  This should

5   include a review of the entire transcript of jury voir dire in order to conduct a comparative

6   analysis of the jurors who were stricken and the jurors who were allowed to remain.  <u>Boyd</u>, 467

7   F.3d 1144, 1149 ("We believe, however, that Supreme Court precedent requires a comparative

8   juror analysis even when the trial court has concluded that the defendant failed to make a prima

9   facie case").  <u>See also</u> <u>Miller-El v. Dretke</u>, 545 U.S. 231 (2005) (using comparative analysis, in a

10   case in which a prima facie showing had been made, to determine whether the prosecutor had

11   been motived by racial bias in exercising peremptory challenges).[6]

12         At the second step of the <u>Batson</u> analysis, "'the issue is the facial validity of the

13   prosecutor's explanation." <u>Hernandez v. New York</u>, 500 U.S. 352, 360 (1991).  "A neutral

14   explanation in the context of our analysis here means an explanation based on something other

15   than the race of the juror." <u>Id.</u> at 360.  "Unless a discriminatory intent is inherent in the

16   prosecutor's explanation, the reason offered will be deemed race-neutral." <u>Stubbs v. Gomez</u>, 189

17   F.3d 1099, 1105 (9th Cir. 1999) (quoting <u>Hernandez</u>, 500 U.S. at 360).  For purposes of step two,

---

18

19         [5] In <u>Batson</u>, defense counsel timely objected to the prosecutor's use of peremptory challenges because they resulted in striking "all black persons on the venire." <u>Id.</u>, 476 U.S. at

20   100.  The Supreme Court held that this was a sufficient basis to find an inference of racial discrimination and that the trial court erred when it "flatly rejected the objection without

21   requiring the prosecutor to give an explanation for his action." <u>Id.</u>

22         [6] Comparative juror analysis refers to "an examination of a prosecutor's questions to prospective jurors and the jurors' responses, to see whether the prosecutor treated otherwise

23   similar jurors differently because of their membership in a particular group." <u>Boyd</u>, 467 F.3d at 1145.  <u>See also</u> <u>Kesser v. Cambra</u>, 465 F.3d 351, 360-362 (9th Cir. 2006) (en banc) (the "totality

24   of the relevant facts" includes "the characteristics of people [the prosecutor] did not challenge."). "If a prosecutor's proffered reason for striking a black panelist applies just as well to an

25   otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination . . . ." <u>Miller-El</u>, 545 U.S. at 241 ("side-by-side comparisons of some

26   black venire panelists who were struck and white panelists allowed to serve" was "more powerful" than bare statistics).

1   the prosecutor's explanation need not be "persuasive, or even plausible."  Purkett v. Elem, 514

2   U.S. at 765, 768 (1995).  Indeed, "to accept a prosecutor's stated nonracial reasons, the court need

3   not agree with them."  Kesser v. Cambra, 465 F.3d at 351, 359 (9th Cir. 2006).  "It is not until the

4   third step that the persuasiveness of the justification becomes relevant--the step in which the trial

5   court determines whether the opponent of the strike has carried his burden of proving purposeful

6   discrimination."  Purkett, 514 U.S. 765, 768 (1995) (emphasis in original).  The question is

7   whether, after an evaluation of the record pertaining to that particular case, the prosecutor's

8   race-neutral explanation for a peremptory challenge should be believed.  Id.

9           In the third step of a Batson challenge, the trial court has "the duty to determine

10  whether the [petitioner] has established purposeful discrimination," Id., 476 U.S. at 98, and must

11  evaluate the "persuasiveness" of the prosecutor's proffered reasons.  See Purkett, 514 U.S. at 768.

12  In determining whether petitioner has carried this burden, the Supreme Court has stated that "a

13  court must undertake 'a sensitive inquiry into such circumstantial and direct evidence of intent as

14  may be available.'"  Batson, 476 U.S. at 93 (quoting Arlington Heights v. Metro. Hous. Dev.

15  Corp., 429 U.S. 252, 266 (1977)); see also Hernandez, 500 U.S. at 363.  "[I]mplausible or

16  fantastic justifications may (and probably will) be found to be pretexts for purposeful

17  discrimination."  Purkett, 514 U.S. at 768.  See also Lewis v. Lewis, 321 F.3d 824, 830 (9th Cir.

18  2003) ("[I]f a review of the record undermines the prosecutor's stated reasons, or many of the

19  proffered reasons, the reasons may be deemed a pretext for racial discrimination.")  In step three,

20  the court "considers all the evidence to determine whether the actual reason for the strike violated

21  [petitioner's] equal protection rights."  Yee v. Duncan, 463 F.3d 893, 899 (9th Cir. 2006).  "A

22  court need not find all nonracial reasons pretextual in order to find racial discrimination."

23  Kesser, 465 F.3d at 360.

24          Petitioners bear the burden of persuasion to prove the existence of unlawful

25  discrimination.  Batson, 476 U.S. at 93.  "This burden of persuasion 'rests with, and never shifts

26  from, the opponent of the strike.'"  Id. at 2417 (quoting Purkett v. Elem, 514 U.S. 765, 768

1  (1995) (per curium).  However, petitioners are "entitled to rely on the fact, as to which there can

2  be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those

3  to discriminate who are of a mind to discriminate.'"  Batson, 476 U.S. at 96 (quoting Avery v.

4  Georgia, 345 U.S. 559, 562 (1953).

5           D.  Analysis

6           As noted above, on August 15, 2007, this court found "petitioners produced

7  evidence sufficient to permit the trial judge to draw an inference that the prosecutor struck all

8  African American potential jurors from the venire.  See Johnson [v. California], 545 U.S. at

9  170." (August 15, 2007 Order at 6.)  Because petitioners demonstrated that the facts give rise to

10 an inference of discriminatory purpose, making a prima facie case, the burden shifts to the state

11 to explain the racial exclusion by offering permissible race-neutral justifications for the strikes.

12          Surprisingly, at the evidentiary hearing held almost eight years after voir dire in

13 the underlying criminal action, the prosecutor recited a laundry list of reasons why he challenged

14 each of the three jurors.  Not surprisingly, none of the reasons were articulated as based on race.

15 Counsel for petitioners suggest that the prosecutor's inference that because Mr. Jones was living

16 with his parents he must not be paying rent draws "a negative inference . . . consistent with a

17 racially discriminatory intent on his part." (Pet.'s Brief at 4.)  However, on its face, the

18 prosecutor's statement was race-neutral because even Caucasian children live with their parents

19 without paying rent.  None of the reasons articulated by the prosecutor at the evidentiary hearing

20 demonstrated inherent discriminatory intent; thus, the reasons are deemed race-neutral.  Stubbs,

21 189 F.3d at 1105.  This court moves now to stage three of the Batson analysis.

22          Petitioners claim that the prosecutor's reasons for striking the three African-

23 American jurors, which he described at the evidentiary hearing, were a pretext for racial

24 discrimination.  Thus, this court will evaluate the record to determine whether the prosecutor's

25 /////

26 /////

1  stated reasons for excluding the three African American jurors from petitioners' jury pass

2  constitutional scrutiny.[7]

3                 i. <u>Prospective Juror Mr. Jones</u>

4                 The oral voir dire of Mr. Jones was as follows:

5                 THE COURT:  . . . Mr. Jones, question number 22, you gave me an answer that I
   wanted you to explain it a little more.  It says what are your opinions about
6                 defense attorneys, and then you said they are trying to defend the guilty.  And
   maybe you meant the accused.  I don't know.

7

8                 MR. JONES:  Yeah, that's what I meant.

9                 THE COURT:  I think simply because somebody's been accused,
   there's evidence of any guilt.

10                MR. JONES: No, you got to prove his guilt, you know what I'm
   saying?
11

12                THE COURT:  Fair enough.  That was the only question I had for
   you. . . .

13 (Reporter's Transcript on Appeal "RTA" II:344.)

14                MR. BULLARD:  . . .  Good morning, Mr. Jones.

15                MR. JONES:  Good morning.

16                MR. BULLARD:  As I said, one of the things that we're going to .
   . . ask you to do, if you are selected as a juror in this case, is to
17                weigh the evidence.  You are going to have to listen to perhaps two
   sides of a story and make a decision as to what happened.
18

19                One of the things that the Judge is going to tell you that you have
   to do is, when you're looking at a witness who testifies, one of the
20                things you can do is you can take into consideration someone's
   motive or bias or interest in testifying.

21                Is that something that you feel you would be able to do?

22                MR. JONES:  Yes.

23                MR. BULLARD:  Make a decision in this case?

24

25     [7] Petitioners bear the burden of proving their factual contentions by a preponderance of
   the evidence rather than by clear and convincing evidence, because the state court decision is not
   entitled to deference under AEDPA.  <u>See</u> <u>Taylor v. Maddox</u>, 366 F.3d 992, 1013 n.16 (9th Cir.
26 2004).

1          MR. JONES: Yes.

2          MR. BULLARD:  Okay.  Great.  Thank you, sir.

3  (RTA II:466.)

4          MR. FREITAS:  . . . do you have any problems with the felony
           murder rule as we talked about it?

5

6          MR. JONES:  No.

7          MR. FREITAS:  Do you have any problem with an aider and
           abettor, the driver being just as responsible as the man who pulled
           the trigger?  Even if a person agrees not to shoot somebody, that
8          there is going to be no harm involved, because of natural and
           probable consequences, as they agree to commit the armed robbery,
9          someone gets killed, that the . . . get-away driver would be held just
           as responsible.

10

11         MR. JONES:  (Nodding.)

12         MR. FREITAS:  Now, one of the answers you gave in your
           questionnaire, and to the defense, was that you needed – you agree
           that there would be two sides to every story, that you would need
13         all the evidence.

14         What might even happen, the People would put on their witnesses,
           put on their case, sit down, and the defense would say, "We decide
15         not to call any evidence."

16         Then you would have to weigh the evidence that you had and put it
           up to the standard or it . . . doesn't meet the standard."  You can't
17         guess about what maybe someone else might have saw, what a
           witness might have said or something like that.  You have to
18         decide the case solely upon the evidence here and see whether or
           not, in fact, it reaches that standard of beyond a reasonable doubt.

19

20         Could you do that?

21         MR. JONES:  Yes, sir.

22         MR. FREITAS:  Could you do that without speculating or guessing
           what the other side might have said or what the other side of the
           story might be?

23

24         MR. JONES:  Yes.

25         MR. FREITAS:  Okay.  That's the questions I had.

26  (RTA II:516-17.)

1          The prosecution's challenge to Mr. Jones was the seventh peremptory exercised in

2   the first group of jurors.

3          After Mr. Freitas made a peremptory challenge to Mr. Jones, defense counsel

4   made a motion under <u>Wheeler</u>, and the record reflects the following:

5          MR. BULLARD:  It appears to me that Mr. Jones is a young
           African-American gentleman and both Mr. Thompson and Mr.
6          Johnson are young African-American gentlemen.

7          I looked at the jurors that are sitting out there.  I did not see any
           other potential African-American jurors.  I know Mr. Trimble, who
8          answered one of the questionnaires, I don't know that he's here.  I
           was specifically looking for him, because it appears to me that he
9          was African-American, but I don't . . . see him out there . . .

10         THE COURT:  I don't know whether he is or isn't.

11         MR. BULLARD:  I didn't see him.

12         THE COURT:  This afternoon.

13         Ms. Chapa appears to be African-American, but that's just my
           guess, of course, she's gone by now.
14
           MR. BULLARD:  I don't know.  All I'm saying is when I looked
15         out there at the potential jurors that are left, I did not see any, and I
           am not saying that that's 100 percent correct, but I'm saying it
16         appears that Mr. Jones at this point is one of the few, if any,
           African-American jurors out there.  I didn't see anything wrong
17         with any of his responses so . . .

18         THE COURT:  What is your motion?

19         MR. BULLARD:  I am making a motion to dismiss the panel.

20         THE COURT:  Why specifically?

21         MR. BULLARD:  Because I don't believe that there's a fair
           representation of the community left on the panel, specifically with
22         regards to Mr. Jones.

23         THE COURT:  Are you saying something about why Mr. Freitas
           exercised that challenge?
24
           MR. BULLARD:  Yes.
25
           THE COURT:  What do you think he's done?
26

1     MR. BULLARD:  I think he has removed Mr. Jones based on his ethnicity.

2     MS. FIALKOWSKI:  Your Honor, if I might just add something?

3     THE COURT:  Sure.

4     MS. FIALKOWSKI:  Ms. Chapa, who was not here prior to
      resuming in court this afternoon, she apparently showed up at the
5     lunch hour, and I believe – and please correct me if I'm wrong –
      the Court indicated a willingness to basically put her back into the
6     prospective voir dire.

7     THE COURT:  That's correct.

8     MS. FIALKOWSKI:  If there was a stipulation, and Mr. Bullard
      and I said that we would stipulate and –
9
      THE COURT:  No.  Mr. Bullard said he needed to check.
10
      MS. FIALKOWSKI:  No, I needed to, and I did, but I would be
11    willing to stipulate.

12    MR. BULLARD:  I was perfectly agreeable to having Ms. Chapa
      back in the rotation.
13
      THE COURT:  Yeah.  Mr. Freitas persuaded me that once you're
14    excused, you're excused, which I agreed would probably be the
      case.
15
      Mr. Freitas, any response?
16
      MR. FREITAS:  First off, I had no idea that Ms. Chapa was of any race.
17
      THE COURT:  Well, I don't know that she is, but she's dark
18    complected, is all I can say.

19    MR. FREITAS:  I don't know.  I've never seen her.  So I don't
      have any idea what race she was.
20
      THE COURT:  I'm not sure it's the person, but at least the clerk
21    indicated that's the person that was walking in.

22    MR. FREITAS:  And I can't imagine how my willingness to
      stipulate to her coming in has any bearing on this motion
23    whatsoever.

24    THE COURT:  Unless they can show that you knew that she was
      African-American.
25
      MR. FREITAS:  What I recall from her, she was from my
26    hometown, and I had her scored pretty middle-of-the-road, but the

fact is she missed the whole period of voir dire.  She missed all of our explanations of the laws that were going on.

THE COURT:  I don't think really it deserves much argument.

MR. FREITAS:  And she also –

THE COURT:  I think that's of no consequence to anyone.

MR. FREITAS:  Not to follow the Court's instructions?

THE COURT:  She was gone.  Who knows whether I can put her back on the panel legally?  Even if everybody agreed to it, maybe it would be – I don't think it's worth the effort to respond to that part.

Let's talk about the rest.

MR. FREITAS:  Well, I don't think the burden has been met either way.  It seems to me that there's some type of population-type percentage on this motion that's going on.  I haven't heard the grounds for a Wheeler motion being elicited by the defense.  If it was a Wheeler motion and if the Court were to understand this to be a Wheeler-type motion –

THE COURT:  He said Wheeler.

MR. FREITAS:  He did say Wheeler?

THE COURT:  He didn't say what his grounds were.  I'm not going to assume what he –

MR. FREITAS:  My understanding of Wheeler is that it requires a systematic exclusion by the prosecution of people based upon their ethnicity.

THE COURT:  Right.

MR. FREITAS:  The Court has the questionnaires in front of it.  It's quite obvious that the challenges the People have made – we've made seven challenges, and one of them happens to be of a group that the defense is complaining about.  A prima facie case requires exclusion and we did not have that here.  I don't see that a prima facie case has been met.

THE COURT:  Mr. Bullard.

MR. BULLARD:  Well, first of all, I think Mr. Freitas had made four challenges before excusing Mr. Jones, according to my calculations.

THE COURT:  Oh, my gosh, more than that.

1    (Interruption.)

2    THE COURT:  Mr. Jones was the seventh challenge.

3    MR. BULLARD:  My mistake then.

4    Anyway, like I said, Your Honor, I only count one or two African-Americans.

5

6    THE COURT:   You don't need to repeat yourself.

7    MR. BULLARD:  I think just because there has been one that has been excluded, that doesn't prevent me from making the motion.

8    THE COURT:  If there's a prima facie case made out that he did that on the basis of some discrimination, no, it wouldn't.  It's just
9    easier if there's more when there's no indications.

10

11   MR. BULLARD:  All I'm saying is just because Mr. Jones appeared to be one of only two or three potential African-American jurors, that doesn't mean that there is a systematic exclusion going
12   on.

13   THE COURT:  You can have a systematic exclusion on the basis of one, but I think you would have to have some solid evidence
14   based on race before you can make a prima facie case.

15   MR. BULLARD:  I know that Mr. Freitas asked the young man several questions about the law, whether he understood and would
16   be able to follow the felony murder rule, which I believe is very important to him, and whether he understood and would be able to
17   follow the aiding and abetting laws, which I believe are very important to Mr. Freitas.

18
     Mr. Jones said, no, he had no problems with that.  He certainly
19   would be able to follow that question, I mean, that law, excuse me.

20   Mr. Freitas asked if he would be willing to return a verdict of guilty, if he proved the case beyond a reasonable doubt, and Mr.
21   Jones indicated, yes, he would.

22   THE COURT:  Well, I heard the voir dire.  Is there something in particular that you want to make out of his questions?

23
     MR. BULLARD:  I just didn't see that there was any other reason
24   for him to remove him, except for the ethnicity.

25   THE COURT:  Do you think I should ask him what his reasons are?

26

18

1          MR. BULLARD:  Yes.

2          THE COURT:  That's because you think you've made out a prima
facie case and that he's done it systematically or he did it on the
3          basis of some discrimination?

4          MR. BULLARD:  Yes.

5          THE COURT:  Okay.  Ms. Fialkowski, anything further?

6          MS. FIALKOWSKI:  No, Your Honor.

7          THE COURT:  I am going to deny the motion.  I don't think
there's been a prima facie case shown.  There was no indication
8          that it was done on the basis of race.

9  (RTA II:593-99.)  Mr. Bullard asked the court to make a record of how many African-Americans

10  remained on the jury venire, but the court refused, claiming there were spectators in the audience

11  among the prospective jurors.  (RTA II:599-600.)  The court said:

12          THE COURT:  I think you can say there were a few African-
Americans in the jury panel, but I don't know how many exactly.
13          It's probably less than a handful, but that's my guess.  I think I
would have to see them up in the box and have some idea.
14

15  (RTA II:600.)

16          At the evidentiary hearing, the prosecutor summarized his reasons why he would

17  not retain Mr. Jones on the jury:

18          Based upon his youth, his lack of maturity, his lack of experiences
outside the home, that he was not capable of participating in the
19          jury process, understanding the legal concepts that were going to
be developed, and thus would not be inclined to return a verdict of
20          guilty, especially when faced with the defense arguments of self-
defense and leniency.
21

22  (Reporter's Transcript of Evidentiary Hearing ("RT") at 30.)

23          The comparative juror analysis demonstrates the following.

24          The jury questionnaires reflect that the prosecution retained alternate juror #2,

25  Steven Trout, even though he was young and not married.  (Impaneled Jury Questionnaires

26  ("IJQ" at 2395.)  Mr. Trout was 23 and Mr. Jones was 24 years old and both were not married.

(IJQ at 2395; Clerk's Augmented Transcript on Appeal ("CATA") at 1.)  Mr. Freitas retained Mr. Trout on the jury even though he testified that being young and single were "extremely negative factors."  (RT 19.)  Mr. Freitas did not voir dire Mr. Trout about his youth or marital status.  (RTA IV:915-18.)

Mr. Freitas also drew a negative inference from Mr. Jones' answer that he "stayed with his parents," assuming that meant Mr. Jones did not pay rent.  (RT 19.)  Mr. Freitas did not clarify this fact on voir dire, and failed to explain at the evidentiary hearing why he viewed this as an "extremely negative factor."  (RT 19.)

Mr. Jones lived in Stockton.  (CATA at 1.)  The prosecution claimed that having a juror who lived in the community was usually a plus, but in this trial, he didn't want someone from Stockton because the instant case was a gang case and there is heavy gang activity in Stockton.  (RT 20.)  However, the jury questionnaires reflect that jurors Timothy Bennetts, Gloria Landes, Celia Guardado, Lee Harron and alternate juror Daniel Harris all lived in Stockton, yet were retained on the jury by the prosecution.  (CTA 2213, 2216, 2317, 2200, 2356.)

The prosecution also placed great weight on the fact that Mr. Jones could not spell, even misspelling the title of his own job.  (RT 20.)  The prosecution was concerned that Mr. Jones would have difficulty understanding the complicated jury instructions.  (RT 23-24.)  However, Mr. Jones had two years of college as a computer programmer, and jurors Aaron Ruiz, Donald Simons, Lee Herron, Gloria Smith, Leo Martin, and alternate juror Daniel Harris only graduated from high school.

In addition, the prosecution failed to explain how poor spelling translated into difficulty understanding.  Mr. Jones would not have to write a jury instruction.  He would listen to the judge read it and perhaps read it himself if the judge allowed the jury to have a copy of the jury instructions in the jury room.  The most writing a juror would have to accomplish would be to check the appropriate verdict box on a verdict form, and that function is usually performed by
/////

1  the jury foreperson.  This court finds the criticism of poor spelling, as it relates to one's

2  performance as a juror, to be trivial in the extreme.

3          But even assuming good spelling is an appropriate factor to screen out a potential

4  juror, the record reflects that Mr. Bennetts (Juror No. 1), who was impaneled, was a worse speller

5  than Mr. Jones.  (IJQ 2221, 2213, 2215, 2217, 2218, 2219, 2220, 2221, 2223.)  Although he

6  didn't misspell his job title as an instructional assistant, he stated he worked with "severlly

7  handicaped students."  (IJQ 2213.)  And, Mr. Bennetts had one and a half years of college, yet

8  the prosecution didn't find his completion of the jury questionnaire inconsistent with his

9  education.

10          The prosecutor characterized as "fatal" Mr. Jones' response that he would not

11  follow the Court's instructions on the law if they were different than what Mr. Jones thought the

12  law was.  (RT 30.)  In the questionnaire, Mr. Jones responded to the question about defense

13  attorneys by responding they "defin the guity."  (Sic.)  (RT 22.)  This response caused the

14  prosecution to question his spelling difficulties and the incorrect understanding of the law.  (RT

15  22.)  He also found fault with Mr. Jones' response to the question whether police officers are as

16  truthful as other witnesses.  (RT 22-23.)  Although Mr. Jones marked the "same" box, he wrote

17  in "the same until their proven guilty, they are innocent."  (RT 23.)  Because this question asked

18  for an explanation, the prosecutor found this answer unresponsive.  (RT 23.)

19          However, the prosecutor failed to voir dire Mr. Jones on any of these responses.

20  Indeed, the prosecutor only asked Mr. Jones four questions on voir dire, all based on Mr. Jones'

21  understanding of legal principles involved in the case, and Mr. Jones answered each question

22  appropriately.  (RTA II:516-17.)  Review of Mr. Jones' questionnaire responses does not support

23  a finding that Mr. Jones was too confused to serve as a juror, particularly in light of the

24  prosecutor's failure to voir dire him about the responses with which the prosecutor was allegedly

25  concerned.  Although Mr. Jones was late to court and confused about where he was supposed to

26  go despite receiving instructions from the court, he had not served on a jury before.  The record

1   does not reflect that Mr. Jones was subsequently late for court.  However, on February 29, 2000,

2   prospective jurors 29 and 46 were late to court.  (Clerk's Transcript on Appeal ("CTA"), Vol. 7

3   at 1951.)  On March 7, 2000, jurors 5 and 29 were late to court.  (CTA, Vol 7 at 1967.)  Juror 5,

4   Grant Rogers, was ultimately seated as a juror.

5          Despite the myriad other reasons the prosecutor offered for challenging Mr. Jones,

6   this court finds that the above inconsistencies raise an inference of discriminatory purpose.  "A

7   Batson challenge does not call for a mere exercise in thinking up any rational basis."  Miller-El v.

8   Dretke, 545 U.S. 231, 252 (2005).  The fact that "one or more of a prosecutor's justifications do

9   not hold up under judicial scrutiny militates against the sufficiency of a valid reason."  McClain

10  v. Prunty, 217 F.3d 1209, 1221 (9th Cir. 2000).  See also United States v. Chinchilla, 874 F.2d

11  695, 699 (9th Cir.1989) (stating that, although reasons given by prosecutor "would normally be

12  adequately 'neutral' explanations taken at face value, the fact that two of the four proffered

13  reasons do not hold up under judicial scrutiny militates against their sufficiency").

14         A prosecutor's motives may be revealed as pretextual where a given explanation is

15  equally applicable to a juror of a different race who was not stricken by the exercise of a

16  peremptory challenge.  See Caldwell v. Maloney, 159 F.3d 639, 651 (1st Cir.1998).  "Peremptory

17  challenges cannot be lawfully exercised against potential jurors of one race unless potential

18  jurors of another race with comparable characteristics are also challenged."  McClain,  217 F.3d

19  at 1220-21.  As explained above, the prosecutor justified his peremptory strike against Mr. Jones

20  because he was young and single, yet he failed to strike Mr. Trout who was also young and

21  single.  Although he also struck Mr. Jones because he lived in Stockton, several other seated

22  jurors lived in Stockton.  Finally, one other juror was an even worse speller than Mr. Jones and

23  Mr. Freitas did not challenge Mr. Bennetts.  A comparison between Mr. Jones and these other

24  jurors fatally undermines the credibility of the prosecutor's stated justification for excusing Mr.

25  Jones and demonstrates that Mr. Jones' youth, marital status, residence and poor spelling could

26  not have genuinely motivated the prosecutor to strike him.  See Chinchilla, 874 F.2d at 695

1 (holding that an appellate court may overturn the finding of the trial court where a comparison

2 between the answers given by prospective jurors who were struck and those who were not fatally

3 undermines the prosecutor's credibility).  If the prosecutor's reasons were genuine and not merely

4 pretextual, he would have excluded the other jurors on the same basis, which he did not.

5         The record also supports this inference of discriminatory purpose based on the

6 prosecutor's failure to clear up doubts about Mr. Jones' alleged confusion or misunderstanding of

7 the law by asking follow-up questions.  Ali v. Hickman, ___ F.3d ____, 2009 WL 1924792 (9th

8 Cir. 2009), citing See Kesser, 465 F.3d at 364 ("We expect the prosecutor would have cleared up

9 any misunderstanding by asking further questions before getting to the point of exercising a

10 strike." (quoting Miller-El, 545 U.S. at 244).)  As noted above, Mr. Jones answered each of the

11 prosecutor's four voir dire questions appropriately and without confusion.  The prosecutor failed

12 to ask Mr. Jones any questions related to the alleged concerns expressed during the evidentiary

13 hearing.

14         Thus, an analysis of the "totality of the relevant facts," including a comparison of

15 Mr. Jones to other seated jurors, refutes the prosecutor's non-racial justifications for his

16 peremptory challenge of Mr. Jones.  Moreover, the prosecutor's failure to ask follow-up voir dire

17 in an effort to clear up his alleged concerns, suggests he made up nonracial reasons to strike Mr.

18 Jones.  Finally, the prosecutor's later peremptory challenges eliminated all of the African-

19 Americans from the jury panel.  Even the state court of appeal found "there is nothing in the

20 questionnaire or voir dire responses of Mr. J to suggest a nondiscriminatory basis for a

21 peremptory challenge."  (People v. Johnson, slip op. at 9.)  The "Constitution forbids striking

22 even a single prospective juror for a discriminatory purpose."  United States v. Vasquez-Lopez,

23 22 F.3d 900, 902 (9th Cir.1994).

24         For the foregoing reasons, this court finds that the prosecutor's stated reasons for

25 excluding Mr. Jones were a pretext for eliminating him from the jury on account of his race.

26 /////

1   This constitutes a violation of <u>Batson</u>.  Accordingly, the <u>Batson</u> challenges brought by petitioners

2   Thompson and Johnson should be upheld with respect to the prosecutor's exercise of a

3   peremptory challenge to prospective juror Mr. Jones.

4                     ii.  <u>Prospective Juror Mr. Green</u>

5              During voir dire, Mr. Green was questioned as follows:

6              THE COURT:  Then, Mr. Green, I had several questions for you.
               There were several that you missed.  Let me start with those.
7              Those are the easiest ones.

8              I think 48.  They had these questions about firearms.  Do you
               disagree in any manner with the current firearms laws – excuse me
9              here.  Hang on a second.

10             I know what you missed.  You wrote, yes, you disagree, but then it
               says please explain.  Particularly when you disagree, we need to
11             know what your explanation is.

12             Is there something that you disagree with in the current firearms
               laws?
13
               MR. GREEN:  Not really, no.
14
               THE COURT:  How do you feel about firearm laws?
15
               MR. GREEN:  Fine.
16
               THE COURT:  Then did you answer – why did you answer "yes"
17             then?  Was that just a mistake or –

18             MR. GREEN:  Probably it was a mistake.

19             THE COURT:  Then you missed Question 54.  Have you heard of
               the following gangs?  There was a whole list of them.  So give me
20             a "yes" or "no" if you've heard of them.

21             West Side Bloods, WSB.  "Yes" or "no."  Have you ever heard of
               them?
22
               MR. GREEN:  The who?
23
               THE COURT:  Have you ever heard of the West Side Bloods, or in
24             parentheses, we have the initials WSB?

25             MR. GREEN:  Not really West Side or the other one, but I have
               heard of a few gangs.
26

1    THE COURT:  I am going to ask you about particular ones and then you can tell me about others.

2

3    MR. GREEN:  Right.

     THE COURT:  Have you ever heard of the West Side Bloods or the initials WSB?

4

5    MR. GREEN:  I can't recall.

6    THE COURT:  Okay.  I'll put that sort of a questionable no.

7    Louis Park Piru's or LPP, have you ever heard of them?

8    MR. GREEN:  No, no really.

9    THE COURT:  Not no really or –

10   MR. GREEN:  No, sir.

11   THE COURT:  Conway Crips, CC?

12   MR. GREEN:  I don't think so.

13   THE COURT:  Questionable no.

14   Conway Barrios Sureno, CBS?

15   MR. GREEN:  No.

16   THE COURT:  South Side Stocktone [sic], Norteno, SSS?

17   MR. GREEN:  No, I don't think so.

18   THE COURT:  Questionable no.

19   North Side Gangster Crips?

20   MR. GREEN:  No.

21   THE COURT:  No.  Now, tell me about any others you've heard of?

22

23   MR. GREEN:  Well, you know, the Crips and this and that, but not – not so much what side of town they're on, but I've heard about the Crips.

24

25   THE COURT:  Maybe you can tell me something about what you heard about them.

26   MR. GREEN:  No, not really.

25

1    THE COURT:  You heard something about them somewhere.

2    MR. GREEN:  Well, you know, people on the street talking about
3    – kids.  Kids think it's a big thing being in this gang or that gang.
     That's about it.

4    THE COURT:  Have you known anybody whose children were
     either in a gang or somebody thought they might be in a gang or
5    something like that?

6    MR. GREEN:  No, not that I could recall.

7    THE COURT:  Okay.  Question 73 I think you missed.  You said
     you could follow this law, but you didn't say whether you agreed
8    or disagreed with it.  This is the one about a witness who is
     willfully false in one material part of his or her testimony is to be
9    distrusted in others.  You may reject the whole testimony of
     witnesses who willfully has testified falsely as to a material point
10   unless from all the evidence you believe the probability of truth
     favors his or her testimony in other particulars.  Do you agree with
11   this law?

12   In other words, that's saying if a person who lies about an
     important part of their testimony is to be distrusted in other parts,
13   but you could still, depending on what they say and the other
     evidence, you could still believe them in some part of their
14   testimony, because even liars sometimes tell the truth.  So that's
     the idea we're trying to get across there.
15
     Do you agree with that?
16
     MR. GREEN:  I do.
17
     THE COURT:  Okay.  And then there was one that I wanted to ask.
18   I think it was 41 – 71.  We had this question about you or
     members of your family or close friends ever been arrested, and
19   you said yes.  You mentioned a person and I assumed that to be
     your son.
20
     Is that what it was?
21
     MR. GREEN:  Right.
22
     THE COURT:  I just wanted to know what the relationship of that
23   person was.

24   Then 71, let's see what the problem was there.  This was the
     question a number of people had some difficulty with.
25
     People are allowed to participate in their own trial obviously and
26   their attorneys are expected to represent them as well as they can,

but no defendant in any trial is required to prove anything, including to prove their innocence.  On the other hand, you said that you feel the defendant is required to prove his innocence and you said yes.

Would you have a different answer now?

MR. GREEN:  That he's required to –

THE COURT:  Let me ask you this question.  Do you feel a defendant is required to prove his innocence, in other words?

MR. GREEN:  No, huh-uh.

THE COURT:  There is some uncertainty.  You gave a pause.

MR. GREEN:  Yeah, maybe.

THE COURT:  In a criminal trial, the defendant is presumed innocent.

MR. GREEN:  Right.

THE COURT:  The prosecution has the burden of proving them guilty.  The defendant has no burden at all.  In some societies, the defendant is guilty until the defendant proves his innocence.  We don't have that sort of kind of set laws.  We have it the other way around.

Do you think if it's important enough to convict somebody, it's important . . . enough to see, and the People are required to bring that proof?

MR. GREEN:  Yes.

THE COURT:  That makes sense to you?

MR. GREEN:  Un-huh.

THE COURT:  Thank you.  I think that answers my question on that one.

(RTA III:605-10.)

MR. BULLARD:  Good afternoon.

ALL PROSPECTIVE JURORS:  Good afternoon.

MR. BULLARD:  . . .

/////

27

1    Just again kind of collectively as a group, you all understand that
     the prosecution has the burden of proving the case beyond a
2    reasonable doubt.

3    Does anybody disagree with that or have a problem with that?

4    No.

5    Do you understand if you're selected as a juror in this case, and
     you listen to all of the evidence and you're back in the jury room,
6    and you say to yourself, "Jeeze, I don't really know what the heck
     happened here, but I think maybe he did it, maybe he's guilty."
7
     Do you understand that if that's your feeling then you have to
8    return a verdict of not guilty?  That's the burden that we are talking
     about here.
9
     Do you understand all of that?
10
     Yes.
11
     You're willing to follow that?  There's no problem whatsoever?
12
     Okay.
13
     I'm sure if someone does have a problem, you'll let me know.
14
     Just very quickly, some of the other things that we were talking
15   about is this idea that someone has been alleged to be a gang
     member.  Does that present a problem for anyone, specifically a
16   problem whether they think they can be fair in this kind of a case?

17   No.

18   Okay.  Great.

19   (RTA III: 616-17.)

20       MR. BULLARD:  And, Mr. Green, good afternoon, sir.  You said
     that you may or may not have some familiarity with gangs, and I
21   think what you are saying is that you may be familiar with some of
     the labels or terms, but you're not – you're not actually familiar
22   with – or may be you are.  I don't know.

23   Are you familiar with anyone that you think is a member or –

24       MR. GREEN:  Not that I know of.

25       MR. BULLARD:  Right, right.  Sort of – I think what you are
     saying, you are familiar sort of generally with Crips and Bloods
26   and that sort of thing –

1       MR. GREEN:  Yeah.

2       MR. BULLARD:  -- but nothing real specific?

3       MR. GREEN:  Right.

4       MR. BULLARD:  And anything about the allegation . . .  that there
        are gangs – alleged that there are gangs involved in this case,
5       anything about that that you think might be a problem for you in
        this case?

6       MR. GREEN:  No.

7

8   (RTA III:  618-19.)

9       MS. FIALKOWSKI:  Mr. Green, I only have one question for you.
        I think that just might be a box that you didn't check here.

10

        One of the questions was:  Have you or any family members been a
11      victim of any crime, and you checked the box "no."  Then there's
        like A, B, C.  Then under C, the question is:  Do you think that will
12      influence you in the case and you marked "yes."

13      MR. GREEN:  Would you repeat that?

14      THE COURT:  What number is that?

15      MS. FIALKOWSKI:  Number 42.

16      THE COURT:  Thank you.

17      MS. FIALKOWSKI:  The question says:  Have you or any family
        members or close friends ever been the victim of any crime
18      reported or unreported and you checked the box "no."

19      MR. GREEN:  No.

20      MS. FIALKOWSKI:  Is that correct?

21      MR. GREEN:  Uh-huh.

22      THE COURT:  Excuse me, I'm looking at the wrong
        questionnaire.  I couldn't figure out why, what you were reading.

23

        MS. FIALKOWSKI:  Okay.  Then I think we're all on the same
24      page.

25      If "yes" please explain.  So since you said "no" you didn't put
        down an explanation.

26

1    Then there's other questions underneath there and one says:  do
     you think that will influence your judgment in this case and you
2    checked the box "yes."

3    Can I show it to him?

4    THE COURT:  Yes, or you can show him mine.

5    MS. FIALKOWSKI:  I know we had a whole lot of boxes for
     everybody to check and a lot of those just got lost there sometimes.
6
     Thank you.
7

8    (RTA III:623-24.)

9    MR. FREITAS:  Mr. Green, someone you know, someone close to
     you or a family member had been arrested for drugs; is that
10   correct?

11   MR. GREEN:  My son.

12   MR. FREITAS:  Okay.  And about when did that take place?

13   MR. GREEN:  He's incarcerated right now.  He has been in about a year.

14   MR. FREITAS:  And was this the first time he was incarcerated?

15   MR. GREEN:  No.  His third time, I believe.

16   MR. FREITAS:  And were the three offenses for drugs?

17   MR. GREEN:  Uh-huh, yes.

18   MR. FREITAS:  Was there a robbery offense or an attempted
     robbery offense in there at one point?
19
     MR. GREEN:  Not that I know of.
20
     MR. FREITAS:  Do you have any problems with the law we've
21   talked about in this case?

22   MR. GREEN:  No.

23   MR. FREITAS:  Okay.

24   (RTA III:628.)

25   MR. FREITAS:  Of the six new jurors, is there any of the jurors
     that could not return a verdict of guilty if this case was proven to
26   them beyond a reasonable doubt?

30

1    All negative responses.

2    MR. FREITAS:  Which of the six new jurors could return a verdict
     of guilty if it was proven to them beyond a reasonable doubt?

3
     All positive responses.
4

5  (RTA III:638-39.)

6    After Mr. Freitas made a peremptory challenge to Mr. Green, defense counsel

7  made a motion under <u>Wheeler</u>, and the court following occurred:

8    THE COURT:  Okay.  I don't think the defense has shown a strong
     likelihood that the prosecution is engaging [in] some . . . systematic
9    pattern.

10   Mr. Green was a serious question, in my mind, when I read his
     questionnaire, before I even questioned him, and his equivocal-sort
11   of answers puzzled me even more.  There are a lot of reasons that
     the district attorney would consider excusing him.  In fact, maybe
12   both sides would.  He appears to be a little confused.  In addition, I
     think the prosecution can consider reasonably his son's
13   circumstances, regardless of what his answers are.

14   So I don't think there's been a strong likelihood shown.  So I am
     going to deny that challenge to the panel.
15
     MR. BULLARD:  For the record, Your Honor, he did not appear to
16   me to be confused.  I think he took some time to listen to the
     questions and answer them.  I don't think he appeared confused or
17   that he didn't understand what was being asked of him.

18   THE COURT:  Well, what do you make of his answers when he
     was talking?  I was saying:  Which gangs do you know of?  What
19   do you make of those?  He seemed to be equivocating to me, either
     that or he was confused, or maybe what he really wanted to say is:
20   I recognize the word Blood and Crips but I don't recognize – or
     may be there is something else going on there.
21
     MR. BULLARD:  I asked him specifically if that's what he meant,
22   whether he was familiar with anyone in particular in these groups.
     He said, no, not that he knew of.  I asked him, was it that you were
23   just more familiar with the terms Crips and Bloods?  He said yeah.

24   It didn't seem to me like he was confused or giving some sort of
     equivocal or vague answer.  I think he was trying to be as truthful
25   as possible, that he didn't know any specific gang.

26  /////

31

THE COURT:  I didn't think he was being dishonest.  I don't think he was giving me a direct answer either to these questions.  I think we were pretty blunt with him.

MS. FIALKOWSKI:  I think he's probably a very eloquent individual.  With all due respect, I think this questionnaire needs some major revisions, if we've learned anything from this jury selection process.

THE COURT:  This questionnaire needs some revision.  This particular question didn't.  This one didn't seem to confuse people too much, to the extent people gave an answer, that was sometimes indirectly.

The way we had asked him:  I have heard of Crips and Bloods from the movies or something and that's about all I know or something like that.

In any event, I'm not here to make you agree with me.  You made your point.

Any others?

MR. BULLARD:  No.

MS. FIALKOWSKI:  I only have one other comment.  To be quite honest, I don't know where this fits in.  Mr. Green was asked by Mr. Freitas, when he was relating the fact that his son had been arrested on drug charges and convicted, that didn't he also have an armed robbery in his background, and there's nothing in his questionnaire to suggest that.  I don't know if he's doing some kind of other investigation of jurors.  I don't know if that's permissible.

THE COURT:  I don't know why you're making these comments, if you deny know where you're saying them.  [sic]

MS. FIALKOWSKI:  It just struck me as rather unusual that the only people that were questioned seemed to be the minority jurors in that regard.

. . . .

THE COURT:  I've already made my ruling.

You've had a perfectly good chance to make your record prior to me making my ruling, and I made my ruling and you're arguing with me.  Now you're bringing up something that you're not even making it part of the record on the motion.  You're simply making some observation apparently.  I made my ruling.  I think you've added to it.  I think it's just a gratuitous comment.

1      MR. BULLARD:  I wasn't arguing with you.  I just wanted you to
2      know –

       THE COURT:  Now you're arguing with me.  I think it's a
3      relatively easy slam-dunk ruling on my part.

4      Mr. Green would have been challenged by almost any deputy
       district attorney or probably by most defense attorneys, in my
5      opinion, but that's my opinion.

6   (RTA III:641-44.)

7          The prosecution's challenge to Mr. Green was the ninth peremptory exercised in

8   the third group of jurors seated after the second set of peremptory challenges were made.

9          During the evidentiary hearing, the prosecutor scored Mr. Green as a 3- on a scale

10  of 1 to 5 with 1 being the lowest score.  (RT 41.)  The prosecutor noted that Mr. Green claimed

11  to have a son working as a warehouse worker, but during voir dire it was discovered that his son

12  was incarcerated at that time.  (RT 42.)  The prosecutor said this information made him

13  distrustful of Mr. Green's responses, because his son was a repeat offender with three felony drug

14  convictions (RT 43) and he felt Mr. Green was trying to conceal information that he was under

15  oath to provide (RT 63).  Also, Mr. Green was not a high school graduate, which would impact

16  his ability to understand this complex murder trial.  (RT 44.)

17         The prosecutor was also concerned about Mr. Green's inconsistent responses to

18  gang questions.  Mr. Green failed to check any of the boxes following the question whether he

19  had ever heard of various gangs; because he resided in South Stockton, and had a son in prison

20  on drug charges, the prosecutor would have expected Mr. Green to "have some knowledge about

21  gangs or gang problems in his neighborhood."  (RT 53.)  During voir dire Mr. Green admitted he

22  knew about Crips and Bloods, including the West Side Bloods which were specifically listed in

23  the questionnaire.  (RT 59.)  Mr. Green's failure to disclose this information in the questionnaire

24  contributed to the score of 3 minus.  (RT 59; 54-55.)  Later, when asked whether Mr. Green had

25  familiarity with anyone in a criminal street gang, he responded "not that he knew of."  (RT 61.)

26  When asked if he had specific information he had not mentioned about gangs, Mr. Green

33

1  responded no.  (RT 61.)  The prosecutor found these responses inconsistent with Mr. Green's

2  earlier responses in voir dire.  (RT 61.)  Later, Mr. Green said "kids think it's a big thing to be in

3  the gang," but when the court asked him what kids he knew or what kids told him that, Mr.

4  Green said he didn't know any kids.  (RT 59.)

5  The prosecutor said that the following factors also contributed to his decision to

6  excuse Mr. Green:  his age (he was the oldest potential juror); he rented (prosecutor preferred

7  those who owned their own homes); he was single and had a six month old child, which he

8  believed was irresponsible for a 65 year old; he had the greatest number of errors on his

9  questionnaire,[8] he was not currently employed (the prosecutor preferred jurors who were

10  employed); he was a retired construction laborer (the prosecutor preferred jobs requiring

11  analytical skills); he had not served in the military; he had no prior jury experience, he had no

12  experience with attorneys or judges; he expressed no sympathy for the victim in the juror

13  questionnaire, he had a son who was incarcerated and he was well-liked by the defense.  (RT 97-

14  98.)

15  Petitioners contend that the fact that the prosecutor scored both Mr. Green, who

16  was African-American, and Mr. Rogers (Juror #5), who was Caucasian, with a score of 3-,

17  demonstrates the pretextual nature of the peremptory challenge to Mr. Green.

18  However, Mr. Rogers was not similarly-situated to Mr. Green.  Mr. Rogers lived

19  in Manteca and was not familiar with any gangs.  (IJQ 2286.)  Mr. Rogers did not have a close

20  family member in prison.  (IJQ 2283.)  Mr. Green lived in South Stockton (CATA at 14), in an

21  area known to have gang activity (RT 53).  He missed question 54 concerning whether he had

22  ever heard of certain gangs on the jury questionnaire; when asked on voir dire, his responses

23  /////

24  /////

---

[8] "He had trouble writing in the lines and he chose to . . . put the individuals' names in addition to the other information."  (RT 42.)

were equivocal.[9]  Moreover, Mr. Green's low score was not rehabilitated on voir dire.  (RT 59-60.)  The prosecutor felt Mr. Green should have been scored lower than 3 minus.  (RT 62.)  Juror 5 clarified some of the prosecutor's concerns on voir dire.  (RTA II:572-77; see also 554, 557-59; 566-68.)  The scoring of Mr. Green does not give rise to an inference of discriminatory purpose.

Petitioners also challenge the prosecution's concerns about Mr. Green's untraditional family situation.  (RT 42; 64.)  Mr. Green was 65 years old and had a six month old son.  As pointed out by petitioners, the prosecution did not explain how this man's parentage at age 65 would negatively affect his ability to sit on a jury.  The prosecution did not ask any questions about day care or other issues that might be connected to his attendance at jury service.  While a challenge on the basis of parentage may be trivial, it does not give rise to an inference of discriminatory purpose because a man of any race could parent a child at 65.

Moreover, the facts that Mr. Green was a high school dropout and had a son in prison were race-neutral reasons for this peremptory challenge.  All of the impaneled jurors were high school graduates; ten of them also had earned college credits.  (IJQ 2214, 2227, 2253, 2266, 2279, 2305, 2318, 2370, 2383, 2396.)  None of the impaneled jurors had a close family member in prison.  Both of the petitioners in this action were in custody at the time of trial.

The court finds the prosecutor had legitimate, race-neutral reasons to challenge Mr. Green; thus, petitioner Thompson's claim as to potential juror Mr. Green should be denied.

       iii.  <u>Prospective Juror Mr. Trimble</u>

The oral voir dire of Mr. Trimble was as follows:

THE COURT:  Mr. Trimble, let me get your questionnaire here.  If you would like to answer any of these questions in private, feel free to do so.

MR. TRIMBLE:  It's okay.

---

    [9]  Although the jury questionnaire reflects some answers to question 54 (some were marked no, others had question marks), it appears these marks were added by someone other than Mr. Green.  (Compare <u>Id.</u> at 22 with ART III:605.)

THE COURT:  Let's see.  I think you put – you missed Question Number 21.  So I'll have to ask you that one.  You answered it.  I don't know why I wrote that you missed it – oh, because you didn't explain it, that's why.

Have you ever had a bad experience with an attorney?  You answered yes.  Please explain.  So maybe you can explain.

MR. TRIMBLE:  I just think sometimes when you're working with attorneys they – I had a family law attorney, it was family law, and I was going after a custody case pertaining to my son.  I didn't feel that he did what I paid for him to do.  I thought that he should have allowed me to be more involved in my own case.

THE COURT:  It isn't any of these attorneys here, was it?

MR. TRIMBLE:  No.

THE COURT:  Is that going to carry over and effect this case?

MR. TRIMBLE:  No.

THE COURT:  Okay.  All right.  There are a serious [sic] of – 54, 56 and 56 [sic].  Let me see what it was.  There were a series of questions.

Have you heard of the following gangs – and there's a long line of them – and you said no on those.  Then it said, if yes please explain.

I think you were just explaining, in general, you cannot say these by names.  I think you're saying you don't recognize those names, but Conway and Louis Park.

MR. TRIMBLE:  I was familiar with the area.

THE COURT:  The area.

MR. TRIMBLE:  I think it's Conway Crips or something like that.

THE COURT:  Various things like Conway Crips, South Side, North Side.

MR. TRIMBLE:  I know Conway and Louis Park and this and that.  It's kind of like – there is gang violence over there.

THE COURT:  You said, I pretty much am related to the area.  Can you explain that?

MR. TRIMBLE:  I grew up on A Street.

THE COURT:  Which is near Conway.

1   MR. TRIMBLE:  Right.  It's near McKinley Park, which is about three-quarters of a mile in Conway.

2

3   THE COURT:  It's really not in the Conway area itself.

    MR. TRIMBLE:  Well, I mean, for those areas that they had for the
4   individual gangs.  We did Pixie Woods for quite a few barbecues,
    et cetera, . . . watch the boat races, and things of that nature.  So, I
5   mean, that's kind of what I meant by that.

6   THE COURT:  Is there anything about that involved – alleges
    perhaps that people were members of gangs in those geographical
7   areas?

8   MR. TRIMBLE:  No.

9   THE COURT:  Is there any particular gang problem in your
    neighborhood?  You said everything is there, but is there anything
10  in your particular neighborhood?

11  MR. TRIMBLE:  I just think you cannot afford it.  As long as they
    don't come to my front door, you know, you go out looking for it,
12  and hopefully it won't find me or my kids.

13  THE COURT:  Then you worked for an employer at one point in
    the past where some of the people that you served you thought had
14  gang involvement.

15  MR. TRIMBLE:  (Nodding.)

16  THE COURT:  Do you think that any of those associations that
    you had there are going to pose a problem to your fairness here?
17
    MR. TRIMBLE:  No.  That was at a youth program and pretty
18  much it was for the disadvantaged youth.  We kind of took
    whatever came along, and those we changed, we changed.  Those
19  we can help, we helped.  Those we didn't – we couldn't save them
    all.
20
    THE COURT:  Those were my questions.  Thank you.
21

22  (RTA III:886-89.)

23  MS. FIALKOWSKI:  I noticed on your questionnaire that you put
    down that you were in the Army for quite a few number of years.
24
    MR. TRIMBLE:  One month shy of eleven.
25
    MS. FIALKOWSKI:  One month shy of eleven.  You said that you
26  served on court martial boards.

1    MR. TRIMBLE:  Well, there's an involvement before you get to court martial proceedings.

2    MS. FIALKOWSKI:  Okay.

3

4    MR. TRIMBLE:  I went through one court martial proceeding and it's – more or less, you go through a lot of things and then it goes to court.  So it's – more or less, I went through a lot of proceedings but never made it to court a lot.

5

6    MS. FIALKOWSKI:  Was it a case involving you?

7    MR. TRIMBLE:  No.

8    MS. FIALKOWSKI:  So you were like involved because you were a witness or you were investigated?

9

10   MR. TRIMBLE:  I was military police and we were gathering information.  So we would go out and we would gather information and we would turn it over to the desk sergeant, turn it over to the proper investigator and what have you.  If that case went any further, I was required to come back and attend, and I did, and I've only had to attend one.

11

12

13   MS. FIALKOWSKI:  Did you have to testify when you had to attend?

14

15   MR. TRIMBLE:  Yeah.

16   MS. FIALKOWSKI:  Was that the only time you had to testify?

17   MR. TRIMBLE:  No.  I've had to testify for myself before.

18   MS. FIALKOWSKI:   Okay.  And when you were on either of these court martial boards or the military police, did they give you like – I know nothing about the military.

19

20   MR. TRIMBLE:  It's a good branch.

21   MS. FIALKOWSKI:  Bear with me.  Did you have like special training?  I know if you are a police officer, you go through an academy and you go through training.

22

23   Do you have something similar in the Army?

24   MR. TRIMBLE:  Yes, but unlike the police department, the first thing in the Army you do is train to be a soldier, okay.  Then after that, then you're trained for an occupation skill, and mine was just military police.  Unlike in Stockton, the military police, I was not, as you would say, Garrison MP, where I patrol the streets of Stockton or what have you.  I jumped in my Jeep and I went out to

25

26

the fields with the infantry.  I was on a lot of rapid deployment units.  Whenever a balloon went up, I went.  So if it was Honduras, Panama, whoever, you know.  It wasn't like I was sitting behind a desk or patrol car doing traffic stops.

MS. FIALKOWSKI:  Okay.  Did you learn investigative techniques or something like that?

MR. TRIMBLE:  I did a lots [sic] of school.

MS. FIALKOWSKI:  A lot of school.  If there were to be a witness, say a police officer, would you hold him to a higher standard because you would say, "I wouldn't investigate it that way.  I would do something different"?

MR. TRIMBLE:  No.

MS. FIALKOWSKI:  Your focus in the military is considerably different, it sounds like.

MR. TRIMBLE:  I guess it's kind of different from law enforcement today.  See, we had a lot of discretion, okay.  Also the people we were working with were soldiers.

MS. FIALKOWSKI:  Okay.

MR. TRIMBLE:  So if we went in there and– our job wasn't to quote unquote "destroy a soldier" because we all got to go where the balloon goes up anyway.  So if you had the discretion you did, you made the discretion.  If it was a cut and dry case, it was cut and dry.  It was – it was kind of really easy, you know, because you had a choice basically.  Out here I think the law enforcement has their hands tied on a lot of choices.

MS. FIALKOWSKI:  They kind of report back, but you actually got to make the decision?

MR. TRIMBLE:  If I wanted to – say, for instance, I picked up two guys fighting.  I did not have to take them to jail.  I could take them to their commanding officer.

MS. FIALKOWSKI:  Okay.

MR. TRIMBLE:  Because they were going to be punished in a criminal court anyway.  They would have been punished under the uniform court of military justice, which is a punishment that was issued down by the commanding officer in the beginning.  So instead of me taking them to jail and giving them a hitting, the blotters, et cetera, et cetera, I would just take them and hand them over to their unit, and the unit will handle it themself.  They police themselves in the military.

1          MS. FIALKOWSKI:   Okay.  Good.  Thank you.

2   (RTA III:889-93.)

3          THE COURT:  Mr. Bullard.

4          MR. BULLARD:  You're not going to be offended if I don't ask
    you all the questions I have been asking, but you understand the
5   concept that we use here in the courtroom, the burden of proof is
    on the prosecution to prove beyond a reasonable doubt.

6
           You don't have any problems with that, do you?
7
           MR. TRIMBLE:  No, I don't.
8
           . . .
9
           MR. BULLARD:  Anything about some of the concepts that we
10  have been talking about that might make it difficult for you to be a
    juror in this case?
11
           MR. TRIMBLE:  No.
12
           MR. BULLARD:  Thank you.  That's all the questions I have.
13

14  (RTA III:893.)

15          MR. FREITAS:  Mr. Trimble, was there a morning that you missed
    some of the jury instructions – jury questioning?
16
           MR. TRIMBLE:  No.  I missed roll call and I think I was about six minutes late.
17
           MR. FREITAS:  Six minutes late?
18
           MR. TRIMBLE:  Right.
19
           MR. FREITAS:  Thank you.  That was the question I had.
20

21  (RTA III:893-94.)

22          The prosecution exercised its second peremptory challenge to an alternate against

23  Mr. Trimble.  (RTA III:898.)  Mr. Bullard made a motion under Wheeler and Batson and noted

24  that the prosecution had exercised peremptory challenges against all three African American

25  potential jurors and there were no more African American potential jurors remaining in the

26  venire.  (RTA III:899.)  Mr. Bullard argued as follows:

1      MR. BULLARD:  Clearly from the answers that Mr. Trimble gave,
       you know, clearly it appears to me that he can be fair.
2
       That, in fact, he's probably what can be classified as a pro-
3      prosecution witness, given the fact that he was in the military, a
       member of the military police.
4
       He didn't appear to be confused by any answers.  He appeared to
5      be straightforward.  He indicated that he didn't' have any problems
       being fair in this particular case.
6
       He explained his background in the military.  He explained where
7      he grew up here in Stockton and expressed no problems being fair
       whatsoever.
8
       So at this point in time, since Mr. Freitas has excused Mr. Trimble,
9      I would move to quash this panel and start again with another
       panel.
10

11   (RTA III:899-900.)  After some unrelated dialogue, the following took place:

12     THE COURT:  I am going to deny the challenge.
       I don't think there's a strong likelihood the prosecution is
13     systematically excluding African-American jurors.  I think there is
       enough sufficient reason contained within the questionnaire for the
14     prosecution to exercise a peremptory challenge.

15     This gentleman indicated even though he did have a strong military
       record, he actually worked as a policeman to some extent.
16
       I think the answers with regard to his own arrests and the questions
17     – the answers he gave with regard to the neighborhood he grew up
       in are sufficient cause for the prosecution to exercise their
18     peremptory challenge without even inquiring if that's the reason he
       did so.
19
       So I will deny the challenge.
20
       MS. FIALKOWSKI:   Just for the record, Your Honor, is that with
21     regard to any specific questions or –

22     THE COURT:  Well, I think it's the ones I mentioned, 54 through
       56.  Then the ones with regard to his own arrest, Number 41 –
23     that's the one I was referring to – Number 41 and the various
       subsections of that.
24

25   (RTA III:900-01.)

26   /////

1    The prosecution's challenge to Mr. Trimble was the second peremptory exercised

2  against an alternate juror.

3    At the evidentiary hearing, the prosecutor testified that he had ranked Mr. Trimble

4  as a 1 based solely on the jury questionnaire.  (RT 67.)  He challenged Mr. Trimble because he

5  had a bad experience with an attorney and failed to explain why, and his definitions of public

6  defender and prosecution revealed a bias in favor of the defense.  (RT 69-70; 76.)  Mr. Trimble

7  had been arrested for driving under the influence and domestic and criminal assault.  The manner

8  in which Mr. Trimble explained the offenses led the prosecutor to believe it all stemmed from

9  one incident.  However, upon further research, the prosecutor determined that the assault charges

10 were separate and more recent.  (RT 73-74, 76, 79.)  The prosecutor also discovered that Mr.

11 Trimble had been cited in 1998 for disturbing the peace and violating a court order pertaining to

12 domestic violence, yet failed to report that information on the questionnaire.  The prosecutor did

13 not want Mr. Trimble to serve as a juror in this case because there were women victims in the

14 instant action and women had been victimized in Mr. Trimble's assault case.  (RT 74, 76, 79.)

15   On the questionnaire, Mr. Trimble indicated he wasn't aware of the gangs listed,

16 but then Mr. Trimble told the court that he was familiar with gangs from Lulis Park, West Side,

17 and was related to that area.  (RT 76-77.)  Mr. Trimble had also worked with youth involved in

18 gangs.  (RT 77.)  The prosecutor felt Mr. Trimble was sympathetic to gang members based on his

19 answers concerning youth applicants at Right Track Employment.  (RT 77.)  The prosecutor

20 found these undesirable traits in a gang shooting case.  (RT 77.)

21   The court compared the jury questionnaires of the impaneled jury and did not find

22 a juror similarly-situated to Mr. Trimble yet retained on the jury panel.  None of the impaneled

23 jurors were victims or perpetrators of domestic violence.  None of the seated jurors had worked

24 with youth involved in gangs.  Mr. Trimble's criminal conduct in 1998 was recent to the 2000

25 trial in these cases; none of the seated jurors had recently been cited for criminal conduct.

26 /////

1    The court finds the prosecutor had race-neutral, legitimate reasons to challenge

2 Mr. Trimble; thus, petitioner Thompson's claim as to prospective juror Mr. Trimble should be

3 denied.

4    For the foregoing reason, IT IS HEREBY RECOMMENDED that

5    1.  The applications for a writ of habeas corpus be granted based on

6 petitioners' Batson claim with respect to prospective juror Mr. Jones;

7    2.  Respondent be directed to release petitioners Johnson and Thompson from

8 custody unless proceedings in the state court leading to retrial are commenced within sixty days

9 from the date of any order by the district court adopting these findings and recommendations; and

10    3.  In all other respects, petitioner Thompson's petition be denied.

11    These findings and recommendations are submitted to the United States District

12 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

13 days after being served with these findings and recommendations, any party may file written

14 objections with the court and serve a copy on all parties.  Such a document should be captioned

15 "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that

16 failure to file objections within the specified time may waive the right to appeal the District

17 Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

18 DATED:  August 18, 2009.

19

20                                         UNITED STATES MAGISTRATE JUDGE

21

22 001; john2063.157

23

24

25

26

43